Wilfred Weathers v. Commissioner. Dorothy E. Weathers v. Commissioner.
Weathers v. Commissioner
Docket Nos. 35198, 35199.
United States Tax Court
1953 Tax Ct. Memo LEXIS 327; 12 T.C.M. (CCH) 314; T.C.M. (RIA) 53095; March 25, 1953
William E. Dougherty, Esq., 723 Pittock Block, Portland, Ore., and Ralph R. Bailey, Esq., for the petitioners. John D. Picco, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these consolidated proceedings respondent has determined the following deficiencies in income tax for the year ended December 31, 1944: Docket
No.
Petitioner
Deficiency
35198
Wilfred Weathers
$10,827.35
35199
Dorothy E. Weathers
11,775.88
The first issue is whether petitioners received constructive income of $48,000 in 1944, or ordinary income in 1945. The second issue is whether the *328 statute of limitations has run so as to prohibit the assessment and collection of additional income tax. Findings of Fact Some of the facts are stipulated and are so found. Wilfred Weathers and Dorothy E. Weathers, husband and wife, filed their 1944 income tax returns with the collector of internal revenue for the district of Oregon. Petitioners now reside near Rickreall, Oregon. In 1944 and 1945, as partners, they engaged in general farming; their principal crop was hops. On or about January 8, 1944, petitioners entered into a "Crop Mortgage and Agreement" with S. S. Steiner, Inc., a firm of hop brokers with local offices at Salem, Oregon. This was a standard hop growers' contract and chattel mortgage, and by this contract petitioners agreed to sell their prospective 1944 hop crop. At the same time other similar contracts covering each of the three subsequent years were entered into by the parties. The contract, in part, is as follows: "Seller agrees to sell and deliver to buyer, and buyer agrees to purchase from seller, under the terms and conditions herein expressed, the crop or crops of hops now being, standing or growing or to be grown on the land leased/owned by seller, *329 known as the Jerman Hop Ranch, situate in the County of Marion, State of Oregon, embracing 505 acres, more or less, on which land there are now growing or under cultivation 234 acres of hops, more or less, * * * "The price to be paid for the hops to be delivered hereunder shall be the grower's ceiling price or prices as established by OPA or other governmental agency for the kind and quality of hops delivered hereunder. In the event that no such ceiling is in effect then the price to be paid for the hops to be delivered shall be the grower's market price for the kind and quality of hops delivered, but in no event less than 75" per pound. * * *
"Seller agrees to deliver, for inspection and acceptance, the hops sold hereunder, in part or in whole, as buyer may elect, in bales f.o.b. cars, trucks, or in warehouse, at buyer's direction, at Salem, between the 1st day of Sept., 1944, and the 31st day of Oct., 1944, in each of the years included in this agreement of sale, the particular date of any partial or total delivery hereunder being at buyer's option. "Upon delivery of said hops, in a quantity, condition and quality strictly conforming to this agreement, and upon acceptance *330 thereof by buyer, buyer agrees to pay seller the price hereinbefore set forth for hops accepted each year, less advances made hereunder, provided all other provisions of this agreement have been performed by seller. Buyer agrees to advance to seller, if required and upon ten (10) days written request therefor, as part payments under this contract the amount necessary to cultivate, grow, harvest and bale the hops hereunder sold, * * * "Seller represents and agrees that the following is a first mortgage and lien on said crop of hops, and that no further mortgage or other lien shall be placed thereon, without the prior written consent of buyer. * * *
"It is understood that this constitutes the entire agreement between the parties and that no representation oral or otherwise by any agent or representative of the buyer shall in any way alter this contract or terms thereof." On or about February 12, 1944, petitioners purchased the Jerman Farm for a consideration of $130,000. Of the total consideration, $60,000 was paid in cash and the balance of $70,000 (represented by two installment promissory notes for $35,000 each) was secured by a first mortgage. Of the cash payment, $40,000 *331 was borrowed by petitioners from S. S. Steiner, Inc. A note for this sum was secured by a second mortgage against the farm. Some time between January 8, 1944, and February 12, 1944, petitioners and the hop buyer's agent made an oral agreement whereby petitioners would in 1944 receive from the buyer advances for growing and harvesting expenses of the 1944 crop, and that on or about January 5, 1945, petitioners would be paid by the buyer the balance due them for their 1944 hop crop. A like agreement was carried out for the 1945 hop crop; for that year petitioners received advances in 1945 and a final payment in 1946. Petitioners duly raised and harvested the 1944 hop crop; the hops were then delivered to the buyer at Salem during the months of September and October. A total of 1,095 bales were delivered and accepted by the buyer. An aggregate of $137,104.64 was credited to the petitioners' account. Petitioners received payments for this crop as follows: Advances on Contract
(Jan. 28, 1944 thru Sept. 25, 1944)
$ 93,000.00
Payments in Settlement
Nov. 4, 1944
6,104.64
Jan. 5, 1945
36,375.00
Interest credited on petitioners'
note to buyer
1,625.00
Total received for 1944 crop
$137,104.64
*332 As the 1944 crop was delivered to the buyer, an aggregate of $83,000 of the deliveries were offset against the $93,000 of advances made during the year. As of December 31, 1944, the buyer's books showed that petitioners owed S. S. Steiner, Inc., $10,000 for advances and S. S. Steiner, Inc., owed the petitioners $54,104.64 for accepted hops. All of petitioners' partnerships and individual returns were prepared on the cash basis. The amount of $89,104.64 ($83,000 plus $6,104.64) was reported as income from hops on the partnership return for 1944. The balance of the sales price, $48,000, for the hops produced in 1944 was not reported as income for that year. Of this $48,000, $45,000 was included in petitioners' partnership return for 1945, and duly reflected in their individual income tax returns for that year. The remaining $3,000 was inadvertently omitted from the returns in either 1944 or 1945. During 1945, in addition to the amounts above, S. S. Steiner, Inc., paid the petitioners advances on their 1945 hop crop. The balance of the purchase price for the hops produced in 1945 was paid on January 5, 1946. It was duly reported on petitioners' partnership and individual returns *333 for 1946. Petitioners' individual income tax returns for the year 1944 were filed on March 15, 1945. The notices of deficiency involved in these proceedings were mailed March 19, 1951. On February 8, 1950, petitioners signed a Form 872, entitled "Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax", and it was executed on behalf of the Commissioner on February 10, 1950. The period for assessment for 1944 was thereby extended to June 30, 1951, by the execution of this form. Opinion The respondent contends that petitioners received constructive income in the amount of $48,000 in 1944 under section 42, I.R.C.[1] Petitioners, on the other hand, contend that this sum was income in 1945, the year in which the buyer actually paid the balance for the hop crop delivered for the year 1944. *334 Petitioners received advances from the buyer for their crop in the amount of $93,000 in 1944. As petitioners made deliveries to the buyer, the buyer offset the payments for these deliveries against prior advances until the sum of $83,000 was offset against advances. As of December 31, 1944, there was a balance of $10,000 of advances unpaid or not offset on the buyer's books, even though the petitioners had already delivered, and the buyer accepted, some $137,104.64 worth of hops. In November 1944 the buyer gave petitioners a check for $6,104.64 and this, together with the $83,000, made a total of $89,104.64 which was reported as income in petitioners' 1944 returns. The total price for the crops of $137,104.64 less the amount reported in 1944, $89,104.64, left a balance of $48,000 which is the contested sum. An examination of these facts indicates that petitioners actually received $10,000 of the disputed $48,000 in 1944; that is, petitioners received the $93,000 in advances and only the $83,000 of deliveries offsetting these advances were reported as 1944 income. Since petitioners were on a cash basis and since the hop deliveries were such as to entitle them to this full sum of *335 $93,000, which they had already received, it is proper that their 1944 income be increased by this $10,000. This is not a question of constructive income for the $10,000 was actually received and was therefore properly includible in the gross income for 1944. Respondent is sustained as to the $10,000. We must next consider the remaining $38,000 which was received by petitioners in 1945; part of this was paid by check and part credited to petitioners' interest account with S. S. Steiner, Inc.
The doctrine of constructive receipt is a fiction and in an early decision of the Board of Tax Appeals, John A. Brander, 3 B.T.A. 231, it was announced that this doctrine should be sparingly applied. See also Adolph Zukor, 33 B.T.A. 324. In Cecil Q. Adams, 20 B.T.A. 243, 246; affd., 54 Fed. (2d) 228, we said: "But, in general, income should not be construed to have been received prior to the date of actual receipt except where a taxpayer turns his back upon income or does not choose to receive income which he could have if he chose. * * *" Furthermore, the doctrine will not be applied except in a clear case. Hal E. Roach, 20 B.T.A. 919. *336 In William A. Hines, 38 B.T.A. 1061, 1067, we quoted C. E. Gullett, 31 B.T.A. 1067, as follows: "that amounts due from a corporation but unpaid, are not to be included in the income of an individual reporting his income on a cash basis unless it appears that the money was available to him, that the corporation was able and ready to pay him, that his right to receive was not restricted and that his failure to receive resulted from exercise of his own choice." We think that the facts and issue in this case are similar to three prior decisions, James F. Oates, 18 T.C. 570, Howard Veit, 8 T.C. 809, and Kay Kimbell, 41 B.T.A. 940. These decisions favor petitioners' position. In each of these cases an original contract had been made providing for future payments under a specific formula. However, prior to the time when such amounts were determined and prior to the time the taxpayers had acquired any right to secure the payments, the parties entered into new agreements which amended the terms of the pre-existing contracts. Further, these contract amendments were made before the date on which the definite right for payment *337 had come into being under the prior contract. There was a new agreement in each instance as to how the company would make a payment in discharge of its liability, if and when such liability for payment arose. In the present case, as in the Oates, Veit and Kimbell cases, the issue turns on the recognition to be given to a second agreement. If the parties had a right to make the first agreement they had a right to make the second. Our only concern is whether this second agreement actually existed and was intended as a real, genuine, bona fide agreement between the parties. Kay Kimbell, supra.In the present case the second agreement was made prior to the harvesting and delivery of the crops. The agreement for part payment in 1944 and 1945 was made before any payment was due at all, before any right to that payment accrued. The testimony of the petitioners and the buyer's agent supported the existence of the oral agreement which supplemented the written contract to sell. The actual payment for the 1944 crop was in 1944 and 1945, and, likewise, the actual payment for the 1945 crop was in 1945 and 1946. We can only conclude that the question at issue is controlled by the *338 oral agreement entered into prior to February 12, 1944, and we hold that agreement for payment of the 1944 crops in 1944 and 1945 to be valid. In sustaining the petitioners' contention as to the $36,000, we are following the general rule which provides that a cash basis taxpayer reports income in the year of receipt. Under the facts before us there has been no distortion of income which would require the application of the doctrine of constructive receipt in 1944. In the matter of the second issue, the petitioners alleged that the statute of limitations was a bar to the assessment and collection of the deficiencies. Unfortunately for the petitioners, the record does not support their contention. Wilfred Weathers reported a gross income of $6,223.98 for 1944; Dorothy E. Weathers reported a gross income of $6,223.99 for 1944. One-half of $10,000, or $5,000, is clearly in excess of 25 per cent of the gross income reported by each petitioner; therefore, section 275 (c) of the Code [2] is applicable. *339 The returns for 1944 were due March 15, 1945. The consent agreements of each petitioner extending the period for assessment to June 30, 1951, were executed on February 8, 1950. This is within the five-year period set by section 275 (c). Since the deficiency notices were mailed March 19, 1951, the notices were timely and the statute of limitations is not a bar to the assessment and collection of the deficiencies as found herein. Decisions will be entered under Rule 50. Footnotes
1. SEC. 42. PERIOD IN WHICH ITEMS OF GROSS INCOME INCLUDED. (a) General Rule. - The amount of all items of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under section 41, any such amounts are to be properly accounted for as of a different period. * * *↩
2. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. (c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩