OLMSTED INCORPORATED LIFE AGENCY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78887. Filed December 22, 1960.

---

[5] The stipulation of facts does not state how much this was as of April 25, 1956.

430

*James P. Irish, Esq.*, and *John T. Haughey, Esq.*, for the petitioner.
*Arthur B. Bleecher, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined a deficiency in the petitioner's income tax for the year 1956 in the amount of $27,009.34. The issues are:

(1) Whether the entire fair market value of a contract under which petitioner obtained the right to receive an annual fixed amount over a period of 15 years is includible in petitioner's gross income in the year the contract was effective, and

(2) Whether the amount received by the petitioner is taxable as ordinary income or as capital gain.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

The Olmsted Incorporated Life Agency, hereafter called the petitioner, is an Iowa corporation chartered in 1929 with its principal place of business in Des Moines, Iowa. It filed its corporation income tax return on a cash basis for 1956 with the district director of internal revenue at Des Moines, Iowa.

Petitioner's principal business activity from June 15, 1929, to December 31, 1955, was that of exclusive general insurance agent in the State of Iowa for the Peoples Life Insurance Company of Frankfort, Indiana (hereinafter called Peoples), pursuant to a contract which was executed on June 15, 1929, and amended from time to time. The original contract was executed by Oliver C. Miller as president of the petitioner. Oliver C. Miller, who was president and principal stockholder of the petitioner during 1956, died of a heart ailment on March 3, 1957, at the age of 81 years.

Two or three years prior to 1956 Peoples indicated to Oliver C. Miller that it desired to terminate the petitioner's exclusive agency contract for Iowa. Peoples wished to develop insurance sales in Iowa by dividing the State into small territories. Under the 1929 contract, as amended, Peoples was paying commissions to the petitioner which

were more favorable than the commissions it was paying to other agencies under contracts executed since 1950.

Miller did not accept Peoples' proposal at first, but subsequently his health began to fail and in December 1955 an agreement was executed by Peoples and petitioner, and with Miller, in his capacity as petitioner's principal stockholder, as one of the parties to the agreement. The agreement provided, in part, as follows:

THIS AGREEMENT made and entered into by and between Peoples Life Insurance Company of Frankfort, Indiana, First Party, hereinafter referred to as Company, and Oliver P. [C.] Miller and Rose D. Miller, his wife, and Martha Virginia Johnson, hereinafter referred to as stockholders, and Olmstead [1] Incorporated Life Agency, hereinafter referred to as Olmstead, Second Party, WITNESSETH: That

WHEREAS the Company has heretofore held a contract with Olmstead, by the terms of which Olmstead was the exclusive State agent for the Company in the State of Iowa, and

\* \* \* \* \* \* \*

WHEREAS Olmstead, by the terms of a contract with the Company, has become entitled to certain renewal commissions as provided for in said contract, from which renewals Olmstead is bound by the terms of certain contracts outstanding with individual agents in the State of Iowa, to pay such individual agents renewal commissions as provided in their contracts, and

WHEREAS all of Second parties are desirous of having Olmstead surrender its said contract with the Company and of assigning any and all renewals which may become due and payable on and after January 1, 1956.

Now THEREFORE, it is hereby agreed by and between the parties, each in consideration of the promises and covenants of the other, as follows:

1. Olmstead hereby agrees to, and does hereby surrender, give up and annul its contract now in effect with the Company, such surrender to be effective as of midnight December 31, 1955. The contract hereby surrendered is that which was originally entered into between Olmstead and the Company on June 15, 1929, together with any and all amendments or changes there to [thereto].

2. Olmstead hereby assigns to Company all of its right, title and interest in and to any and all renewals which may have heretofore been earned under the contract heretofore referred to, and becoming payable on and after January 1, 1956. It is agreed and understood that Olmstead shall receive, and the Company shall pay to Olmstead, as soon as practical, the renewals to which Olmstead has become entitled arising from premiums paid to the Company during the month of December, 1955, which renewal commissions to be so paid to Olmstead shall be computed in conformance with the customs heretofore in effect between the parties.

\* \* \* \* \* \* \*

5. As a further consideration for the execution of this contract, the stockholders, and each of them, and Olmstead, agree that none of them will enter into a contract with any person, firm or corporation, by the terms of which contract such stockholder or Olmstead is to sell or offer to sell in the State of Iowa, any contract of life insurance for any person, firm or corporation. It is agreed and understood this shall not prohibit the Company, and any one or more

---

[1] There is no explanation for the difference in the spelling of petitioner's name in the above agreement.

of the stockholders, or Olmstead, from entering into a new contract with the Company, by the terms of which such stockholders or Olmstead may sell life insurance for the Company.

6. As a further consideration for the payments herein called for by the Company, Olmstead agrees that it will immediately turn over to the Company any and all papers, documents and records having reference to the business heretofore operated by Olmstead under its contract with Company; in explanation of the items to be so turned over, but not in limitation thereof, are to be included all agent's contracts, policy holder's cards, records of commissions paid by Olmstead, and any and all other documents which may assist the Company in continuing the business of writing life insurance in the State of Iowa, or may assist the Company in conforming with the acts to be performed by it by the terms of this agreement as hereinafter set out.

7. In consideration of the promises and acts of Second parties, the Company agrees that it will issue forthwith, payable to the order of Olmstead Incorporated Life Agency, or to such person or persons as Olmstead may direct in writing, an annuity or annuities calling for a total payment of $500.00 per month, beginning February 1, 1956, and a like payment on the first day of each month thereafter, until a total of 180 such payments, including the first, shall have been paid. * * *

\* \* \* \* \* \* \*

8. As a further consideration the Company agrees that it will pay to the agents heretofore employed by Olmstead, such renewal commissions as may be required by the contracts the agents held on or prior to December 15, 1955; it is agreed and understood that the Company shall be substituted for and on behalf of Olmstead in said contracts and that the sums required to be paid by Olmstead under such contracts shall be paid by the Company. Provided that this shall not bar nor prohibit the Company from exercising all options to cancel or otherwise end such contracts in as full and ample a manner as Olmstead might have done.

Pursuant to this agreement, Peoples executed a contract on December 31, 1955, in which it agreed to pay to "OLMSTED INCORPORATED LIFE AGENCY, the Annuitant, a first income payment of $500.00 on the first day of February, 1956, and a like payment on the first day of each month thereafter, until a total of 180 such payments, including the first, shall have been paid"; and then further provided, as follows:

PROVIDED, no assignment of this contract shall be of any effect so far as the Company may be concerned, until the original or a duplicate thereof is filed at the Home Office of the Company, and its receipt duly acknowledged. The Company assumes no responsibility for the validity of any assignment. The Annuitant specifically shall have the right to assign its rights under this agreement, except, however, that the Company shall at no time be required to pay any one payment due hereunder to more than three persons, either legal or natural.

This contract is made in consideration of the payment of one dollar cash in hand, receipt of which is hereby acknowledged, and certain other valuable considerations, including the surrender of a certain contract by the terms of which the Annuitant has heretofore been an agent of Peoples Life Insurance Company, with certain rights and obligations more particularly set out in said contract, covering the State of Iowa.

Peoples based the total amount of consideration it would pay to the petitioner under the December 1955 agreement upon the present value of the petitioner's renewal commissions that would be due after January 1, 1956. Using tables with a 2½ per cent interest rate, Peoples computed the present value of petitioner's future renewal commissions as approximately $80,000, and computed the present value of the 180 monthly payments it agreed to make to petitioner under the contract as $76,153.

In the Federal estate tax return filed by the estate of Oliver C. Miller on December 3, 1958, there were listed 50 shares of Olmsted Incorporated Life Agency at a value of $53,292.72, with the explanation that the commuted value of the Peoples contract was $63,951.27 as of the date of decedent's death and that decedent's 50 shares were valued at five-sixths of that amount.

Petitioner reported in its 1956 corporation income tax return only the amounts actually received by it under the contract in that year, or $5,500. (The return shows total income of $6,182.79 and total deductions of $7,438.33; no tax is shown as due for 1956). Respondent included in petitioner's income for 1956 the entire fair market value of the contract, or $67,924.47, with the explanation that it represented the consideration received by petitioner during the taxable year "from the cancellation or termination of your life insurance agency contract with Peoples Life Insurance Company, Frankfort, Indiana."

OPINION.

Respondent, on brief, expressly "disavows any reliance on the doctrine of constructive receipt as a basis of the deficiency in income tax which is here at issue." Respondent's argument is that the agreement, effective on January 1, 1956, between petitioner and Peoples was a "sale or other disposition" of the petitioner's right to renewal commissions within the meaning of section 1001(b) of the Internal Revenue Code of 1954,[1] and that, consequently, the annuity, which is property, is taxable to the extent of its fair market value as ordinary income in the year received (1956) pursuant to the contract.

This case is ruled by James F. Oates, 18 T.C. 570,[2] and the affirmance of that case, Commissioner v. Oates, 207 F. 2d 711. In the Oates case the taxpayers were two insurance agents who, at retirement, executed an amended agency agreement with the insurance company providing that future renewal commissions should be paid to them in specified equal monthly amounts over a 15-year period, irrespective

---

[1] (b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

[2] On February 1, 1960, the Commissioner withdrew his 1952 nonacquiescence in this decision and substituted his acquiescence therefor.

of when and in what amounts the renewal commissions would have become due and payable under the original agency contract. It appears that under the taxpayers' old contracts the bulk of their renewal commissions would be collected by them in the first 5 years after retirement and along about the ninth year the collections would dwindle off to almost nothing. Thereafter and in accordance with the election given by the amendment to the contract, the taxpayers elected to receive their payments in equal amounts over a 15-year period with provision for a lump-sum final payment if anything remained in the agent's renewal commission account. The respondent in that case ignored the amended contract and, relying largely on the assignment of income cases, determined that the taxpayers were taxable on the renewal commissions as they accrued under the terms of the original agency contract, prior to the amendment. We held for the taxpayers, stating that "under their amended contracts which were signed prior to their retirement they were not entitled to receive any more than they did in fact receive and that being on the cash basis they can only be taxed on these amounts [actually received] and that the remainder will be taxed to them if and when received by them."

Respondent seeks to distinguish the *Oates* case by arguing that in that case the contract was not transferable and the rights thereunder nonassignable, while here the petitioner's rights to the periodic payments were assignable. We cannot conceive what difference in principle this would make. Also in the *Oates* case the rights and interests under the contract were subject to assignment with the written consent of the insurance company, and a careful examination of the amendment to the general agent's contract indicates quite clearly that the periodic payments to the taxpayers were "subject to the rights of any assignee."

Respondent also makes much of the testimony that Peoples was ready in December 1955 to pay the commuted value of the renewal commissions to petitioner in a lump-sum payment. The executive officer of Peoples testified that "We told him he could have it either way but we decided upon the annuity. We knew that Mr. Miller wanted to prolong his income." It would seem from this that *Peoples* decided upon the annuity. However, even if the choice were up to petitioner, it is clear that he had no *right* to demand cash as of December 1955. Nothing was due and payable at that time. The parties were simply bargaining for a suitable agreement and it is this agreement, which was bona fide and legally binding, that determined the rights of petitioner in 1956.

Respondent seeks to distinguish the *Oates* case in that there the agency agreement was only amended while here it was extinguished and a new contract executed. Also in the *Oates* case the contract

amendment merely bound the insurance company to pay the agents their renewal commissions (over 15 instead of 9 years) while here the new contract extinguished petitioner's old contract and gave the agent an annuity for 15 years.

The contract amendment in the Oates case was virtually a new contract. We called it that in our opinion. In the affirming opinion in *Commissioner* v. *Oates*, supra, the court stated: "The amended contract was in the nature of a novation, that is, a substitution of a new agreement or obligation for an old one which was thereby extinguished."

It is obvious from a study of the *Oates* case that the payments under the amendment were in the form of an annuity that would return to the taxpayer over a 15-year period the renewal commissions to which he was entitled after allowance for death, surrender, and lapse of policies. It was not a contract *for an annuity* but it had that effect for the computations were made after experience studies and in accordance with tables of the insurance that would be expected to renew.

In the instant case it is shown that the annuity was computed about the same as were the payments in the *Oates* case. The executive vice president and secretary of Peoples testified:

> The way that we arrived at that offer was to take the present value of his renewal commissions, using two and a half per cent interest and recognized lapse tables, better known as Linton's tables. And according to our figures it came out more than the present value of the annuity which we gave to Mr. Miller. The present value was approximately eighty thousand dollars. The present value of the annuity was seventy-six thousand one hundred and fifty-three dollars.

The fact that here the new contract was an annuity and in the *Oates* case it was not, points up no difference that would warrant different tax treatment.[3] In both, the deferred payments were computed to return to the agents their future renewal commissions. The only difference is that in the *Oates* case the company set up a renewal commission account for the agents on its books and made disbursements to the agents from these accounts. Here the company received the full renewal premiums without deduction for commissions and paid

---

[3] In affirming our opinion in the *Oates* case the Seventh Circuit, in *Commissioner* v. *Oates*, 207 F. 2d 711, quoted with approval the language of this Court in a Memorandum Opinion where the agent gave up all rights for renewal commissions in exchange for $500 a month as long as he lived. The opinion of the Circuit Court contains the following:

"'* * * Thus in L'Esperance, 2 T.C.M. 442 (1943) that court said: '* * * A new contract was entered into by the parties by which the petitioner gave up all his rights under the contract by which he was engaged and in return therefor was to receive and did receive $500 per month beginning March 1, 1937. * * * It cannot be doubted that renewal commissions which might have been received by the petitioner under his contract after he had resigned as branch manager would constitute taxable income of the petitioner. * * * The same rule must be followed where an amount was paid by the Assurance Co. each month in lieu of commissions upon renewal policies.'"

the agent what would be his commissions from its general funds. It is of passing interest to note the insurance official here testified Peoples actually did set up a ledger account of petitioner's renewals "just to see how we would come out on this thing" and he added "so far we are all right."

Respondent's whole argument here is that in 1956 petitioner made a "sale or other disposition" of its right to renewals within the meaning of section 1001(b), I.R.C. 1954, and received in exchange therefor an annuity contract of the then value of $76,153 and consequently the latter sum is income to petitioner in 1956 and taxable as ordinary income.

We think the reality of the transaction should govern. The agent here was in the same situation as were the agents in the *Oates* case. In both cases the agents were retiring and they had agency contracts that would entitle them to future renewal commissions. The exact amounts they would receive could not be foreseen because of deaths, surrender, and lapses of policies. But insurance companies are fond of acting upon what, in insurance language, is called "experience." In both cases the new contracts were designed to return to the agents the full amount of their future renewals, after allowance for deaths, surrender, or lapses of policies. In the *Oates* case experience tables were used to compute the payments but the new contract took a form that would, over the 15 years, insure the payment of the amount of the agent's renewal commissions with deductions for deaths, surrender, and lapses of policies. Here there was prior computation of the insurance that would be expected to renew, from recognized insurance tables, and the new contract took the form of returning to the agent the full amount of renewal premiums after prior allowance for what recognized tables showed would be the deaths, surrender, and lapse of policies. We see nothing but a difference in form in the two transactions. In both instances the agents entered into new contracts at a time when there was nothing due and payable to them under their agency contracts, and the new contracts merely continued the insurance company's obligations under the old contracts.

The opinions in the *Oates* case hold the agent made no assignment of the commissions to be due under the agency contract and the transaction was, as we said in our opinion, "a new agreement * * * as to how the company would make payments in discharge of its liability if, as, and when such liability for payment arose." The same can be said here. The new contract merely provided for a different manner whereby the insurance company could discharge its liability under the agency contract which was being abrogated.

In the cases decided under section 1001(b), I.R.C. 1954, and its antecedent statutes, it is the taxpayer who is sometimes arguing a trans-

action amounts to a "sale or other disposition" of property in order to secure capital gains treatment or the recognition of a loss. Thus in *Motor Products Corporation*, 47 B.T.A. 983, affd. 142 F. 2d 449, we held the refunding of outstanding defaulted bonds pursuant to a refunding agreement that provided for the surrender of the old bonds and the issuance of new refunding bonds, was not a sale or exchange of property giving rise to recognized gain or loss; that it was "merely a substitution of the evidence of the same continuing debt," and the opinion points out:

the refunding agreement to which this petitioner was a party presented a plan whereby the city of Detroit merely issued new bonds in substitution for and in continuation of outstanding evidences of its former bonded indebtedness and the result of the transaction was merely to effectuate an extension of time for payment * * *. The city assumed no additional obligation under the refunding agreement * * * there existed the same debtor, the same principal amount of indebtedness, * * * and the same creditors. * * *

See also *City Bank Farmers Trust Co.* v. *Hoey*, 52 F. Supp. 665; *West Missouri Power Co.*, 18 T.C. 105; *Hort* v. *Commissioner*, 313 U.S. 28; and *Charles E. McCartney*, 12 T.C. 320.

What was said in *Motor Products Corporation, supra,* can be said here. The insurance company's obligation to pay petitioner his future renewal commissions was the obligation of the old contract. When this was canceled and the new contract executed the insurance company had substantially the same obligation to pay the same party the same amounts of the agent's commissions on future renewals. The only change here was the change in payment dates which, as held in the cited cases, is immaterial on the issue we are considering.

We hold there is no significant difference in the facts between this case and the *Oates* case and the same rule applies, to wit: The periodic payments are taxable to petitioner as ordinary income under the annuity contract when and if received. There was no "sale or other disposition" of the agent's right to renewals under the agency contract within the meaning of section 1001(b), I.R.C. 1954, and petitioner realized no gain taxable under said statute.

Petitioner argues the payments it receives under the annuity are entitled to capital gains treatment. We cannot quite tell whether this is being advanced by petitioner as an alternative argument. To prevail it would have to show there was a sale or exchange of a capital asset. Secs. 1221 and 1222, I.R.C. 1954. We have held there was no sale or other disposition of the rights to renewal commissions. In any event, the payments under the annuity contract constitute ordinary income in the year received. *James F. Oates, supra.* In the year before us (1956) petitioner reported deductions in excess of annuity payments and it is not clear how petitioner was treating the contract payments. We hold petitioner must include its payments under

the annuity contract received in 1956 ($5,500) as ordinary income. But since it appears its deductions for that year exceed this amount, no additional tax liability exists for that year. Therefore, there is no deficiency for 1956, and—

*Decision will be entered for the petitioner.*

