PITTSBURGH–DES MOINES STEEL
COMPANY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 70–47.

United States District Court,
W. D. Pennsylvania.

June 15, 1973.

William Y. Rodewald, David B. Buerger, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiff.

Thomas R. Wechter, Tax Div., U. S. Dept. of Justice, Washington, D. C., W. Wendell Stanton, Asst. U. S. Atty., W. D. Pa., Pittsburgh, Pa., for defendant.

## OPINION

TEITELBAUM, District Judge.

The principal issue in this case is whether the gain from the sale of stock by taxpayer, Pittsburgh-Des Moines Steel Company (PDM), is taxable in 1960 or in 1961. The Government claims that the sale was taxable in 1960 and the taxpayer contends that the gain was taxable when payment was made in 1961. Both parties have moved for summary judgment.

In 1960 PDM held 15,960 shares of stock of Horton Steel Works, Limited (Horton). The remainder [1] of Horton stock was owned by Chicago Bridge & Iron Company (Chicago Bridge), which was desirous of obtaining complete control of Horton. Following a period of tentative negotiations, on September 30, 1960, PDM offered to sell all of its Horton stock to Chicago Bridge for $2,043,657.45. On November 17, 1960, Chicago Bridge counteroffered to buy 15,865 shares for $2,021,828.73, plus all subsequently acquired shares at cost. By letter dated November 21, 1960 the taxpayer accepted the counteroffer, adding that it assumed that Chicago Bridge would pay the United States and Canadian transfer tax. On November 22, 1960, PDM delivered the endorsed stock certificates by mail to Chicago Bridge.

The next day, November 23, 1960, PDM executives learned for the first time that 1960 would not be a profitable year for the company. This situation made it advantageous for PDM to defer recognition of the capital gain realized on the sale of the Horton stock until 1961. Thus, on November 23, 1960, executives of PDM and Chicago Bridge conferred by telephone in an attempt to resolve the problem. Following that conversation, taxpayer sent a new letter to Chicago Bridge, backdated to November 21, 1960, requesting that payment of $205,334.90 be made immediately and that payment of $1,825,451.90 be made on January 3, 1961.[2] Also, on November 23, a Chicago Bridge executive wrote to PDM suggesting that PDM should pay the United States transfer tax (amounting to $812.64), if Chicago Bridge would pay the Canadian tax ($638.40).

This plan was subsequently carried out as agreed upon. On December 1, 1960, PDM received a Chicago Bridge check for $205,334.90 for 2020 shares of Horton stock. On January 5, 1961, taxpayer received a check for $1,825,451.90, which represented the balance of the purchase price for the shares. The taxpayer's proceeds in each instance were reduced by the amount of United States transfer tax while Chicago Bridge paid the Canadian tax on each occasion.

The Government urges that PDM and Chicago Bridge entered into a valid contract calling for the payment of the entire purchase price in 1960 on November 21, 1960 when the taxpayer unequivocally accepted Chicago Bridge's terms.[3] PDM on the other hand cites this Court to Cohn v. Penn Beverage Co., 313 Pa. 349, 352, 169 A. 768, 769 (1934) wherein it was held that "to constitute a contract the acceptance of the offer must be absolute and identical with the terms of the offer." PDM contends that its original November 21 letter added a new condition to the acceptance of Chicago Bridge's offer of $2,021,828.73 for the stock, namely that Chicago Bridge pay

---

1. With the exception of a few shares owned by Horton employees.

2. These figures add to more than the offered $2,021,828.73, the difference to be allocated to the cost of (the 95) subsequently acquired shares.

3. The original November 21, 1960 letter from PDM stated:
   "In reply to your letter of November 17, we accept your offer to purchase from us 15,865 shares of Horton Steel Works stock common at a price of $2,021,828.73."

both the United States and Canadian transfer taxes, thus constituting a counteroffer.

■ Thus, the parties in their briefs suggest that this issue be decided in accordance with the rules of contract law which govern an acceptance which varies the terms of an offer. I find it unnecessary to utilize this ground for decision.[4] I find that the parties entered into a legally binding and valid amendment or modification of their contract on November 23, 1960, by virtue of their telephone conversations on that date and their later correspondence which incorporated the mutually agreed upon changes as to schedule of payment and sharing of transfer taxes.[5]

There is no question but that PDM sought to modify (and succeeded in modifying) its original agreement of sale with Chicago Bridge in order to avoid incurring a long-term capital gain [6] in 1960 which would have eliminated whatever tax advantage it would have enjoyed from the anticipated net operating loss in that year. In itself, there is nothing legally wrong with such a course of action. The taxpayer has a right to minimize his federal income tax obligations. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

The question is not whether this taxpayer has the right to minimize his tax obligations, but whether there exists a

---

4. Avoiding decision as to the effect of an acceptance which varies the terms of the offer obviates the necessity for ruling on two troublesome issues: first, the applicability of the Uniform Commercial Code (UCC) to a sale of securities; and second, the status of UCC § 2–207 in the Commonwealth of Pennsylvania. UCC § 2–207 states: "A definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." The drafters' Comment to § 2–207 provides

"Investment securities" are expressly excluded from the coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities (as was done with the Original Sales Act in Agar v. Orda, 264 N.Y. 248, 190 N.E. 479, 99 A.L.R. 269 (1934) when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with such securities (Article 8).

There is nothing in Article 8 which controls contractual problems which might arise in the sale of securities.

Because the parties clearly intended to modify their original agreement and took legally cognizable steps to effectuate that modification, it will be unnecessary to rule on the applicability of the UCC to the sale of investment securities. But

assuming arguendo that the Code does apply, the second question presents itself. In 1933, 21 years before the passage of the UCC by the State Legislature, the Pennsylvania Supreme Court enunciated the firm rule of the *Cohn* case set forth in the text above. While it is at least possible to reconcile the *Cohn* position vis-a-vis that of § 2–207 (cf., Selig v. Philadelphia Title Insurance Co., 380 Pa. 264, 111 A.2d 147 (1955)), the observer is nonetheless struck with the evident discrepancy between the rules expressed. Apparently, the Pennsylvania Supreme Court has never expressly acknowledged the validity of the § 2–207 position. (See Hedden v. Lupinsky, 405 Pa. 609, 176 A.2d 406 (1962)). Under the circumstances here presented, this Court will not presume to advise the Pennsylvania Supreme Court as to what course it should take or speculate as to what it would decide.

5. This subsequent modification is supported by valid consideration. The parties unquestionably intended to modify the agreement and bargained for the changes that were made. Furthermore, PDM, the party attempting to enforce the modified contract, incurred a legal detriment in agreeing at the time of modification to pay the United States transfer tax.

6. The taxpayer reported a gain of $1,665,-175.38 in its federal corporate income tax return for 1961, representing the purchase price of the shares received from Chicago Bridge, less taxpayer's cost of acquisition ($161,007.00).

doctrine of tax law which renders the means employed unavailable to him. The Government suggests that the doctrine of constructive receipt is such a device.

■ Under the doctrine of constructive receipt, income which is subject to the unfettered command of a taxpayer and which he is free to enjoy at his option is taxed to him, despite the fact that he has exercised his own choice to turn his back on that income. See 2 Mertens, Law of Federal Income Taxation, Section 10.02. The doctrine then, embodied in Treasury Regulations, Section 1.451–2(a)[7] is one by which the form of a transaction is ignored in order to get to its substance. Constructive receipt has particular applicability to questions of the proper taxable year and has been applied most often as to individual taxpayers earning income in one period who attempt to derive its benefits at a later time.

■ In the instant situation, certain facts exist which might, standing alone, lead to the conclusion that PDM constructively received income in 1960, rather than 1961. First is the fact that PDM and Chicago Bridge, at PDM's urging, structured the transaction so as to lead to taxability in the most advantageous year. As has been noted above, this can lead to no inference in and of itself of wrongdoing or of taxability. Second is the fact that immediately after the initial agreement calling for immediate payment was reached, PDM delivered the endorsed Horton certificates to Chicago Bridge. This fact is effective to raise the inference that on November 22, 1960, prior to the parties' amendment of their contract of sale, PDM had an unfettered right to demand payment immediately.

It is important to note however that even assuming PDM had an unfettered

right to the money in 1960, it only had such right for a period of hours—the period after the initial agreement was reached on November 21, 1960, and before PDM received the information on November 23, 1960 which led it to seek and obtain modification of the contract. Once the modification had been accomplished, PDM and Chicago Bridge were bound by their contractual obligation that PDM should receive the bulk of the payment in January of 1961.

■ Therefore this Court finds that even if PDM had an unfettered right to receive payment in 1960, such right only existed in the taxpayer for a matter of hours and is de minimis to the considerations here at hand. An effective modification of the contract of sale having been accomplished, this case is governed by the reasoning used in Commissioner v. Oates, 207 F.2d 711 (7th Cir. 1953) and Commissioner v. Olmsted Inc. Life Agency, 304 F.2d 16 (8th Cir. 1962).

In *Oates,* the taxpayers were insurance agents who, at retirement, amended their agency contract with the insurance company to provide that future renewal commissions should be paid to them in equal monthly installments over a 15 year period, regardless of when and in what amounts the renewal commissions would have become due under the original agency agreement. The Commissioner determined that the agents were taxable on the renewal commissions as they accrued under the original contract. Both the Tax Court (18 T.C. 570) and the Seventh Circuit rejected the Commissioner's contention and found that the amended contract constituted a novation, that the old contract had been extinguished and that the taxpayer had no right to demand compensation for services other than that set out in the new contract.

7. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given.

The Tax Court (18 T.C. at 585) pointed out that the taxpayers

"under their amended contracts which were signed prior to their retirement . . . were not entitled to receive any more than they did in fact receive and that being on the cash basis they can only be taxed on those amounts [actually received]."

In *Olmsted* a similar fact situation arose whereby the taxpayer life agency assigned to an insurance company all rights to renewal commissions on previously written life insurance policies in return for a contract whereby the taxpayer was to receive monthly payments over a 15 year period. Finding *Oates* to be controlling, both the Tax Court (35 T.C. 429) and the Eighth Circuit held that the above transaction was a novation rather than a "sale or other disposition" within the meaning of Section 1001 of the Internal Revenue Code. Since the taxpayer in *Olmsted* was on the cash basis of accounting, he could be taxed on the payments only as received.

It is of course possible to attempt to distinguish the *Oates* and *Olmsted* cases on the basis of their facts,[8] but what is important and controlling about them is not their factual contexts but the reasoning applied in order to reach the proper conclusion. In both *Oates* and *Olmsted* the taxpayers had a more or less immediate right to receive income under contracts of apparently long standing. In both cases, before the actual receipt of that income, taxpayers amended the contracts to provide for payment over a longer term in the future. In both cases the desired effect sought by the taxpayers—the deferral of the receipt of taxable income until a later date—was allowed by both the Tax Court and the Court of Appeals. Here the taxpayer had the theoretical right to receive payment for far less time than its counterparts in either *Olmsted* or *Oates*. As was done in those two cases,

PDM's legally valid modification of the original contract will be upheld.

The further basis for decision in both *Oates* and *Olmsted* was the finding that the taxpayers in both cases were on the cash basis of accounting. PDM alleges, through the depositions of its financial officers, that it has for decades consistently kept its books and filed its tax returns, so far as non-operating income is concerned, on the cash basis. The Government contends that PDM has failed to demonstrate conclusively that it employs the cash basis as to all investment income. It concedes that PDM reports dividend income on the cash basis, but states that taxpayer points to no sale of an investment which straddled two or more tax years which it reported on the cash basis.

I find expressly that PDM was on the cash basis of accounting as to investment income. The logical inference one draws from the fact that PDM has never reported a transaction such as this one on the cash basis is that such a situation has never arisen, not that PDM uses a basis other than the cash method. PDM's use of the cash basis further buttresses the holding that it can only be taxed on cash received in 1961, without regard to the fiction of constructive receipt.

Therefore, summary judgment is granted to plaintiff PDM. It is held that PDM and Chicago Bridge entered into a valid amendment of their agreement for the sale of the Horton stock and the tax consequences are governed thereby. As a cash basis taxpayer PDM may only be taxed on the amount actually received in any given year. It actually received, in accordance with the amended contract, the bulk of payment in 1961 and should be taxed for that receipt in that year. The doctrine of constructive receipt will not be applied. Summary judgment being granted plaintiff on this basis, it is unnecessary to reach the issue of whether or not plain-

---

8. E. g., that income to an individual was at issue rather than a sale by a corporation or that § 1001 is absent as an issue here.

tiff filed a valid election to have the transaction taxed under the installment method. Plaintiff is entitled to a refund in the full amount claimed.

The above constitutes the findings of fact and conclusions of law required by F.R.Civ.P. 52.