CHARLES B. SCHNIERS AND DOROTHY M. SCHNIERS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10225–75.    Filed December 27, 1977.

*William Norton Baker* and *Karl Norman Clifford,* for the petitioners.

*Charles R. Billings,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency of $22,000.11 in petitioners' Federal income tax for 1973. Concessions having been made by petitioners, the sole issue presented for decision is whether petitioners realized income of $45,376.48, representing the proceeds of the sale of their cotton crop, in 1973 even though they did not receive checks in payment for the cotton until 1974.

## FINDINGS OF FACT

Petitioners Charles B. Schniers and Dorothy M. Schniers, husband and wife, were legal residents of Slaton, Tex., when they filed their petition. They timely filed a joint Federal income tax return for 1973, employing the cash receipts and disbursements method of accounting. For convenience, Charles B. Schniers will be referred to as petitioner.

During 1973, petitioner was engaged in cotton farming in the vicinity of Slaton, Tex. Part of his operations covered Farm No. B–360, consisting of 156 acres which he owned, and Farm No. B–233, consisting of 187 acres which he rented from A. H. Buxkemper. Under the rental arrangement, three-fourths of the proceeds from the sale of cotton from the rented property belonged to petitioner and one-fourth to A. H. Buxkemper.

On March 13, 1973, petitioner entered into two contracts entitled "Confirmation of Purchase" in which he agreed to sell, and the Idris Traylor Cotton Co., "Purchaser, or his agent," (sometimes hereinafter Traylor) agreed to buy, at a price keyed to the Government loan values, all cotton harvested and ginned from Farm Nos. B–233 and B–360. The contracts provided that all such cotton would be ginned at the Slaton Co-op Gin (sometimes hereinafter the gin). All cotton was to be delivered to the purchaser promptly upon receipt by the seller of Government classing cards and warehouse receipts. The contracts contained no provision as to when and in what manner the seller would be paid for the cotton. Each contract form was completed by a gin employee, Ethlyn Akin, and signed at the gin on behalf of Traylor by another employee, W. H. Adkins. The contract covering the cotton grown on Farm No. B–233 included the landlord's share as well as that of petitioner. These standardized agreements were developed and printed by Traylor and were placed in several gins through which it contracted to buy cotton.

Subsequent to signing these contracts, petitioner planted and cultivated cotton on Farm Nos. B–360 and B–233. In November and early December 1973, petitioner harvested the cotton from these farms and had it ginned as provided in the March 13, 1973, contracts. The gin delivered the cotton to a warehouse and obtained a warehouse receipt, a negotiable bearer instrument which evidenced title, and a Government classing card for each bale so delivered.

The gin maintained a separate box or drawer for each farmer for which it ginned cotton. In that box, the gin placed the farmer's warehouse receipts and Government classing cards. It is common practice for farmers to leave these documents in their respective boxes at the gin until their cotton is sold.

The gin placed the warehouse receipts and Government classing cards for petitioner's cotton covered by the March 13,

1973, contracts in his box at the gin. On or about December 4, 1973, petitioner met with gin employee Ethlyn Akin, and discussed the sale of his cotton, the delivery of the warehouse receipts to Traylor, and the possibility of deferring the receipts from the sale of his cotton. On December 4, 1973, prior to turning over his warehouse receipts and Government classing cards, petitioner entered into five deferred payment contracts, executed in the name of the gin, calling for the sale of the following amounts of cotton at the price indicated from the farm specified:

| Farm No. | Bales | Price |
|----------|-------|-------|
| B–360 | 101 | $12,882.19 |
| B–360 | 100 | 12,632.39 |
| B–360 | 3 | 360.64 |
| B–233 | 108 | [1]13,646.01 |
| B–233 | 100 | [1]12,355.67 |

[1] Of these amounts, petitioner's three-fourths share was $10,234.51 and $9,266.75, respectively.

These prices were computed pursuant to the deferred payment contracts, all dated December 4, 1973, signed by petitioner as "Grower" and the gin by J. E. Gray, Agent, as "Purchaser." These agreements provided that the grower may deliver cotton to the purchaser, referred to in the body of the agreement as the "Company," on the understanding that title and rights to such cotton shall pass to the company. The price at which the cotton is to be sold will be fixed at the date the cotton is delivered, and the company in its discretion may then sell and market such cotton. Regardless of the delivery date, no advance or payment of any kind will be made by the company to the grower prior to January 2, 1974. The agreement is nonnegotiable, nontransferable, and the grower shall have no right, claim, or action against the company for the payment of the purchase price prior to that date. Within 7 days after the date specified in the contract, the company will advance to the grower the full purchase price less any charges.

Petitioner's objective in signing these deferred payment agreements was to postpone the receipt of the income from the sale of his cotton. Ordinarily in west Texas cotton is harvested during the months of November and December of the year in which it is planted. However, during the fall of 1972, the weather was bad, and most of the cotton crop was neither

harvested nor sold until early 1973. The result was that some of the income which petitioner ordinarily would have realized in 1972 was not realized until 1973. Petitioner's 1973 crop was harvested in November and December of 1973, and he wished to avoid the necessity of reporting as income the proceeds of both his 1972 and 1973 crops as income in 1973.

Each such deferred payment contract was accompanied by a Traylor invoice listing the cotton covered by the respective deferred payment contract. Such invoices were prepared by gin employee Shirley Evans. After signing these five deferred payment contracts, petitioner turned over the warehouse receipts and Government classing cards for the cotton to Ethlyn Akin for delivery to Traylor.

Shirley Evans, who, along with Ethlyn Akin, was authorized to write checks on Traylor's checking account, then drew the following five checks, payable to the gin, on Traylor's bank account at the First National Bank, Lubbock, Tex.:

| Date of check | Memo on check | Amount of check |
|---|---|---|
| 12/5/73 | C. B. Schniers 101 bales, B–360 | $12,882.19 |
| 12/5/73 | C. B. Schniers 100 bales, B–360 | 12,632.39 |
| 12/5/73 | C. B. Schniers 108 bales, B–233 | 13,646.01 |
| 12/5/73 | C. B. Schniers 100 bales, B–233 | 12,355.67 |
| 12/10/73 | C. B. Schniers 3 bales, B–360 | 360.64 |

These checks were deposited in the gin's bank account. Petitioner had no knowledge of the arrangements between the gin and Traylor regarding the handling of the proceeds of the sale of his cotton. J. E. Gray, manager of the gin, had discussed such arrangements with Traylor and Traylor approved them.

Traylor and other cotton buyers paid the gin for services it performed in arranging the purchase of farmers' cotton; keeping on hand, completing and signing sales contracts and invoices, and making payments for the crops out of their bank account. In 1973, the gin earned approximately $10,000 from the performance of those services. Other gins, both cooperative and

independent, performed the same type of service and were compensated in the same manner as the gin.

On January 2, 1974, petitioner went to the gin to collect the proceeds of the sale of his cotton. He received five checks written on the gin's bank account in the amounts set forth in the foregoing table. Of the check in the amount of $13,646.01, only $10,234.51 belonged to petitioner, and of the check in the amount of $12,355.67, only $9,266.75 belonged to him. The remainder of those two checks belonged to A. H. Buxkemper, the owner of Farm No. B–233. A total amount of $45,376.48 from this sale was reported on petitioner's 1974 joint Federal income tax return.

Respondent determined that petitioners' reported gross income for 1973 should be increased by $45,376.48.

OPINION

Section 451[1] prescribes the general rule that "any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer" unless, under the taxpayer's method of accounting, such amount is "properly accounted for as of a different period." Section 1.451–1(a), Income Tax Regs., provides that a taxpayer, such as petitioner, who uses the cash receipts and disbursements method of accounting, shall include in gross income amounts "when actually or constructively received." Section 1.451–2(a), Income Tax Regs., explains the constructive receipt concept as follows:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Respondent maintains that, under this regulation, petitioner constructively received the cotton crop proceeds in question in 1973. He argues that petitioner's deferred payment agreements were not bona fide arm's-length agreements and thus did not shield petitioner from the receipt of income. Further, respondent contends that the Slaton Co-op Gin was petitioner's agent in the

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

sale of the cotton, and the gin's receipt of the sale proceeds was, for tax purposes, the equivalent of petitioner's receipt thereof. Alternatively respondent argues that failure to include the 1973 cotton sales proceeds in petitioner's income for that year would cause a material distortion of income and constitute a change of accounting method.

We hold for petitioner. He contracted in March 1973 to sell his 1973 cotton crops from Farm Nos. B–233 and B–360 to Traylor "or his agent" but did not agree on a specific sale date, the date of payment, or the method of payment. Those contracts were mere promises by petitioner to sell and Traylor to buy harvested and ginned cotton under an agreed price formula. Prior to delivery of the warehouse receipts for the cotton and before petitioner acquired an unqualified right to payment therefor, petitioner entered into the agreements with the gin, acting on behalf of Traylor. Pursuant to those agreements, he delivered title to the cotton, the warehouse receipts, to Traylor, and petitioner became entitled to payment, and was paid, for the cotton on or after January 2, 1974. Those agreements, each entitled "Deferred Payment Contract," though initiated by petitioner, were not mere requests by petitioner that payment for the cotton be delayed. Cf. *Hineman v. Brodrick*, 99 F. Supp. 582 (D. Kan. 1951). They were valid, binding contracts which gave petitioner no right to payment until on or after January 2, 1974.[2] Cf. *Glenn v. Penn*, 250 F.2d 507, 508 (6th Cir. 1958). Under those agreements, until January 2, 1974, the income from the sale of the cotton in 1973 was not "set apart for him" or "otherwise made available so that he" could "draw upon it" within the meaning of section 1.451–2(a), Income Tax Regs., quoted above. Petitioner did not receive such income, actually or constructively, until January 2, 1974. *Robinson v. Commissioner*, 44 T.C. 20, 36 (1965); *Oates v. Commissioner*, 18 T.C. 570, 584–585 (1952), affd. 207 F.2d 711 (7th Cir. 1953); *Amend v. Commission-*

---

[2]The rule was stated in *Oliver v. United States*, 193 F. Supp. 930, 933 (E.D. Ark. 1961), as follows:

"a taxpayer has a perfect legal right to stipulate ·that he is not to be paid until some subsequent year * * * . Where such a stipulation is entered into between buyer and seller prior to the time when the seller has acquired an absolute and unconditional right to receive payment, and where the stipulation amounts to a binding contract between the parties so that the buyer has a legal right to refuse payment except in accordance with the terms of the agreement, then the doctrine of constructive receipt does not apply, and the taxpayer is not required to report the income until the same actually is received by him. *Glenn v. Penn*, 6 Cir., 250 F.2d 507; *Kasper v. Banek*, 8 Cir., 214 F.2d 125; *J. D. Amend*, 13 T.C. 178; *Wilfred Weathers*, 12 T.C.M. 314."

*er*, 13 T.C. 178, 185 (1949); *Veit v. Commissioner*, 8 T.C. 809, 817–818 (1947); *Kimbell v. Commissioner*, 41 B.T.A. 940, 948–949 (1940); *Oliver v. United States*, 193 F. Supp. 930, 933 (E.D. Ark. 1961);[3] cf. *Glenn v. Penn, supra; Kasper v. Banek*, 214 F.2d 125, 127 (8th Cir. 1954).

Respondent emphasizes petitioner's income tax reasons for wishing to defer receipt of his 1973 cotton crop income but never explains precisely what he means by his argument that the deferred payment contracts were not bona fide. In his testimony petitioner freely admitted that his objective in signing such contracts was to avoid bunching the proceeds of his late-harvested 1972 crop and his timely-harvested 1973 crop in a single taxable year. However, that objective does not affect the bona fides of a contract for a taxpayer has a legal right to conduct his business transactions so as to minimize the incidence of taxation. See, e.g., *Cowden v. Commissioner*, 289 F.2d 20, 23 n. 1 (5th Cir. 1961), revg. and remanding on other grounds 32 T.C. 853 (1959) ("desire to save taxes was the sole purpose"); *Amend v. Commissioner, supra* at 185 ("a matter of making my income more uniform"); *Badanes v. Commissioner*, 39 T.C. 410, 416 (1962) ("even if it be assumed that saving taxes was one of the factors"); *Pittsburgh-Des Moines Steel Co. v. United States*, 360 F. Supp. 597, 599 (W.D. Pa. 1973) ("taxpayer has a right to minimize his federal income tax obligations").

The point is that income is not realized by a cash basis farmer from merely harvesting his crops. He realizes income only when he actually or constructively receives income from the sale of those crops. He is not required to sell the crops in the year in

---

[3]See also *Millsaps v. Commissioner*, T.C. Memo. 1973–146; *Weathers v. Commissioner*, a Memorandum Opinion of this Court dated Mar. 25, 1953; Rev. Rul. 58–162, 1958–1 C.B. 234. In Rev. Rul. 73–210, 1973–1 C.B. 211, 212, the taxpayer had agreed to market his cotton through a cooperative but, prior to delivering it, signed a deferred payment contract with the cooperative; the Commissioner ruled:

"In the instant case, at the time the deferred payment contract was entered into, the taxpayer had not yet delivered cotton covered by such contract and therefore did not have an unqualified right to receive payment therefor. The preexisting marketing agreement with the cooperative was merely a promise by the cooperative to pay the farmer for his cotton and a promise by the farmer to sell his cotton to the cooperative.

"Accordingly, it is held that the proceeds from the sale of the cotton delivered after the date the deferred payment contract was entered into are includible in the taxpayer's gross income for the taxable year in which payment is received."

The preexisting marketing agreement in that ruling was analogous to the March 1973 agreement in the instant case, and the deferred payment agreement was similar in principle to the ones in the instant case.

which he harvests them. He may decide not to sell them until the following year. Nor is he required, if he decides to sell them in the year of harvest, to contract for immediate payment for his crops. The contract may call for payment after the close of the harvest year and he does not realize income in the year of sale if the contract is a valid, enforceable one. He may decline to accept sale terms which call for payment in the year of sale in the same manner, for example, as a real estate owner may insist on limiting the year-of-sale payment to 30 percent of the selling price so that he may report his gain under the section 453 installment method. Or he may time the sale in the same manner as a shareholder may time the sale of his stock to offset his gains against his losses in the taxable year.

For respondent's argument on the bona fides of the sale to have any merit, the evidence must show that the deferred payment agreements were shams, and the parties never intended to be bound by them. But the evidence is to the contrary. The agreements were signed by a representative of the gin with Traylor's approval and by petitioner prior to petitioner's delivery of the warehouse receipts for (legal title to) the cotton. Under their terms "it is agreed * * * that No Advance or Payment of any Kind will be made by the Company to Grower" until on or after January 2, 1974. Petitioner did not expect to, and did not, receive any payment or advance on the sale of his cotton until he was paid in January 1974. The manager of the gin testified that the gin deposited the proceeds of the checks it received from Traylor in its general checking account and in no circumstances would it have released these funds to petitioner. While a practice of deferring crop receipts might have added strength to petitioner's case, it is not essential. Cf. *Amend v. Commissioner, supra* at 185. "We are fully satisfied that once * * * [each deferred payment] contract was executed, it was looked upon by both parties as defining their legal rights, and that there was never any collateral understanding, tacit or otherwise, that the parties would not be bound by its terms." *Robinson v. Commissioner,* 44 T.C. at 36. The mere fact that Traylor might have been willing to close the purchase-sale transaction in December 1973 rather than wait until the following January is not a material consideration. *Cowden v. Commissioner, supra* at 23; *Robinson v. Commissioner, supra* at

36. Petitioner was not willing to do so, and it takes at least two parties to make a valid contract.

We find that the December 4, 1973, agreements were not shams, and that the inclusion of petitioner's full share of the proceeds of the cotton sales in 1973 income may not be predicated upon the ground that those agreements did not represent arrangements which were binding on petitioner.

Contrary to respondent's second argument, we think it quite clear that the gin was an agent of Traylor rather than petitioner in signing the deferred payment agreements. The March 13, 1973, agreement, signed at the gin, designated as its parties petitioner and "Idris Traylor Cotton Company, Purchaser, or his agent," thus indicating from the outset that Traylor would close the purchase of the cotton through an agent. Traylor did not have an employee at the gin to buy cotton but authorized the gin to close purchase transactions on its behalf. Gin employees were authorized to receive cotton warehouse receipts and Government classing cards on Traylor's behalf, to invoice the cotton to Traylor, and to write checks on Traylor's account to cover the purchases. The gin earned approximately $10,000 a year in commissions on such purchases. It never bought cotton on its own behalf. Traylor approved the gin's arrangement for delaying the payment to petitioner. We have no reason to doubt petitioner's testimony that he believed the gin employees who dealt with him in accepting his warehouse receipts and executing the deferred payment contracts were acting on Traylor's behalf. Indeed, although he was mistaken, when he received the check for his cotton in January 1974 he thought it was drawn on Traylor's account and was not aware that the check was drawn on the gin's account until he was so informed during the investigative stage of this case.

All these facts and others show that the gin was authorized to, and did, sign the deferred payment contracts on Traylor's behalf. The gin was Traylor's agent, not petitioner's, in handling these transactions. In no sense, therefore, can it be held that the gin acted as petitioner's agent in receiving in December 1973 payment for the cotton he sold to Traylor.

Respondent's alternative argument that petitioner is seeking to change his method of accounting is without merit. The premise of this argument is section 446(e) which provides generally that a taxpayer who changes his method of accounting

must, before computing his taxable income under the new method, obtain the consent of the Secretary or his delegate. Sec. 1.446–1(e)(2), Income Tax Regs. Respondent also maintains that the deferred payment contracts cause a distortion of petitioner's 1973 income by shifting part of it to 1974 and that petitioner's method of accounting called for the income from each year's crop to be reported in the harvest year. Since petitioner failed to obtain permission to make this change, respondent argues, it cannot be given effect.

But the possible distortion in petitioner's income was caused by nature—the wet weather in the fall of 1972 which prevented him from harvesting and selling his cotton crop in that year. Petitioner sought to prevent that distortion. Had petitioner not executed the deferred payment contracts, most of the income from both his 1972 and 1973 crops would have been taxable in 1973. He executed the deferred payment contracts to prevent that bunching of his farm income.[4]

Petitioner's crop receipts were, of course, a material item in computing his taxable income. But the execution of these contracts was not a change of accounting method. "Farmers have great flexibility in timing the receipt of taxable income from harvested crops. They may sell the crops immediately; they may hold them until the next taxable year; or they may sell them in one year under a contract calling for payment in a later year." *Sheldon v. Commissioner*, 62 T.C. 96, 109–110 (1974). Petitioner merely exercised his right to sell the cotton he grew in 1973 under a contract calling for him to be paid for it in 1974.[5] In both 1973 and 1974, he reported his crop income under the cash receipts and disbursements method of accounting. He did not change that method.

---

[4]Petitioner testified:

Q. Why did you enter into the deferred contract arrangements in 1973?

A. Well, I tried to—to keep my income as—as level as—as I can, which isn't—which is hard to do to try—to try to stay in business so you don't pay all your tax one year and then maybe go back—go broke the next.

Later petitioner added:

Well, in 1972, we—we didn't get our crop out until late because of bad weather and stuff and like I said a while ago, as I'd like to maintain as even an income every year as I can.

[5]In Rev. Rul. 58–162, 1958–1 C.B. 234, 235, the Commissioner— "held that the proceeds from the sale of wheat by a farmer, using the cash receipts and disbursements method of accounting, under a bona fide arm's-length contract calling for payment in the taxable year following that in which the wheat was delivered to the purchaser, are includible in his gross income for the taxable year in which payment is received."

To reflect the concessions made by petitioners,

*Decision will be entered under Rule 155.*