In the Matter of the Complaint of ALLIED TOWING CORPORATION, as owner of the BARGE ATC–133 for exoneration from or limitation of liability.

Civ. A. No. 78–407–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Oct. 10, 1979.

Carter T. Gunn, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for petitioner.

John F. Kane, Asst. U. S. Atty., Norfolk, Va., Michael K. Bell, Torts Branch, U. S. Dept. of Justice, Washington, D. C., Timothy G. Hayes, Asst. Atty. Gen. of Virginia, Richmond, Va., for respondent.

## OPINION AND ORDER

CLARKE, District Judge.

On the morning of February 27, 1978, the barge ATC–133, owned by Allied Towing

Corporation (Allied), sank in the Chesapeake Bay, spilling part of its cargo of # 6 oil into the Bay. Thereafter, Allied filed a Complaint seeking exoneration from or limitation of liability under the Limitation of Liability Act, 46 U.S.C. §§ 181–89 (1976) [1] and section 311(f)(1) of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321(f)(1) (1976),[2] as amended by the Clean Water Act of 1977, P.L. 95–217, 91 Stat. 1566 (Dec. 27, 1977). Two parties responded to this Complaint: the United States filed a claim seeking $600,000 for cleanup costs; the Commonwealth of Virginia claimed $130,315.05 for civil penalty, cleanup costs, and damage to natural resources, specifically the loss of 4,884 waterfowl held in trust by the Commonwealth.

By agreement of the parties, embodied in an Order of this Court, the claim of the United States has been settled in its entirety with the payment by Allied of $190,000 to the United States. Virginia has agreed that a limitation be granted to Allied in the amount of $115,000. The sole remaining question to be decided is whether any part of Virginia's claim for damage to its natural resources may be recovered from Allied in an action under state law,[3] notwithstanding its payment of its full liability under the FWPCA, or whether such recovery is preempted by the recent Clean Water Act

---

1. 46 U.S.C. § 183(a) (1976) provides in part:

    (a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

2. Section 311(f)(1) of that Act provides:

    (f)(1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. Such costs shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

3. Section 62.1–44.34:2 of the Code of Virginia provides:

    Liability for permitting discharge of oil.— A. Any person, firm or corporation causing or permitting a discharge of oil into State waters, or owning or operating any facility, vessel or vehicle from which there is a discharge of oil into State waters, shall be liable to the Commonwealth of Virginia for all costs of cleanup, abatement, containment, removal and disposal of the oil and all property damage incurred as a result of such discharge by the State or a political subdivision thereof, and to any person showing damage to his property resulting from such discharge. In any suit to enforce the claims under this article, it shall not be necessary for the State, political subdivision, or person showing property damage, to plead or prove negligence in any form or manner. It shall be a defense that the discharge was caused solely by (a) an act of God (b) an act of war or (c) an act or omission of a third party, or any combination of the foregoing.
    B. Notwithstanding the foregoing, except where the claimant shall prove negligence on the part of the person, firm or corporation causing or permitting a discharge of oil: the liability of the owner or operator of a vehicle under this section for a single discharge shall not exceed one million dollars; the liability of the owner or operator of a vessel or facility under this section for a single discharge shall not exceed five million dollars.

amendments to the FWPCA, leaving the Commonwealth to recover what it may from the fund created by the FWPCA.

■ The Fourth Circuit's opinion in *Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d 609 (4th Cir. 1979), made clear that any claim which Virginia may have against Allied for cleanup costs is not precluded by the FWPCA. Cleanup costs recoverable under that Act include only those actually incurred by the Federal, not state, Government. The states are free, therefore, to recover their cleanup costs under state law. *See Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). Allied properly recognizes Virginia's claim for cleanup costs, but urges that it has satisfied any liability it might have for damages to Virginia's natural resources and property by its settlement with the United States under the FWPCA. Allied argues that the Clean Water Act amendments made the costs of restoring or replacing natural resources, including Virginia's waterfowl, part of the "costs of removal" recoverable only by the United States, and that the states must look to the Federal Government, not the vessel owner or operator, for reimbursement for these costs. Allied relies upon subsections (4) and (5) to section 311(f) of the FWPCA, which were added by the 1977 amendments, and which provide:

> (4) The costs of removal of oil or a hazardous substance for which the owner or operator of a vessel or onshore or offshore facility is liable under subsection (f) of this section *shall include* any costs or expenses incurred by the Federal Government or *any State government* in the restoration or replacement of natural resources damaged or destroyed as a result of a discharge of oil or a hazardous substance in violation of subsection (b) of this section.

> (5) The President, or the authorized representative of any State, shall act on behalf of the public as trustee of the natural resources to recover for the costs of replacing or restoring such resources. Sums recovered shall be used to restore,

rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government, or the State government.

33 U.S.C. §§ 1321(f)(4) & (5) (emphasis supplied). Section 311(k) of the Act, 33 U.S.C. § 1321(k) (1976), establishes a revolving Federal fund, which section 311(c)(2)(H), *Id.* at 1321(c)(2)(H), makes available to the states affected by the discharge of oil for reimbursement of the "reasonable costs incurred in . . . removal" of such discharge.

■ Federal legislation may not be found to supersede a state statute based on a valid exercise of the state's police power "unless Congress has manifested a clear intention to preempt the field or the state statute actually conflicts with the federal law." *Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d at 620, *citing, Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157–58, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). Thus, there is a clear presumption against preemption unless that was the "clear and manifest purpose of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), *quoting, Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

■ Congress specifically addressed the question of preemption in section 311(*o*) of the FWPCA, 33 U.S.C. § 1321(*o*) (1976), which provides:

> (*o*)(1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.

> (2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State.

(3) Nothing in this section shall be construed as affecting or modifying any other existing authority of any Federal department, agency, or instrumentality, relative to onshore or offshore facilities under this chapter or any other provision of law, or to affect any State or local law not in conflict with this section.

This section remained unaltered by the 1977 amendments to the Act. Generally, amendatory provisions should be read together with the original section as if they had been originally enacted as one section. Each part is to be given effect and interpreted so that they do not conflict. 1A Sutherland, *Statutes and Statutory Construction* § 22.34 (1972). Thus, that Congress retained section 311(*o*) following the addition of subsections (4) and (5) to section 311(f) is strong indication that Congress did not intend to disturb state law.

Nor is Virginia's state statute in conflict with the FWPCA, as amended. Allied argues that section 311(f)(1) of the FWPCA makes the owner or operator of a vessel liable to the *United States* for the "cost of removal" of spilled oil. Since new subsection (4) states that the costs incurred by any *state government* in restoring or replacing damaged natural resources *shall* be included among the "costs of removal" collectable by the United States under subsection 311(f)(1), Allied contends that only the Federal Government may recover these costs, up to the liability limits contained in that section. Any recovery of the same costs under state law, Allied concludes, would be inconsistent with this Federal scheme, which permits the states to obtain reimbursement of these costs from the Federal Government's revolving·fund, without limitation, and would represent an unjustified double recovery of these costs.

■ Allied's interpretation, while not necessarily implausible, appears to misconstrue the meaning of these statutory provisions and the intent of Congress in enacting them. First, subsection 311(f)(1) authorizes the United States to recover only "the actual costs incurred . . . for the removal of such oil . . . ." No costs of removal can be recovered by the Federal Government which it has not actually incurred. The Federal Government could incur costs for restoring or replacing a state's natural resources only if it paid these costs directly. Section 311(c)(2)(H) authorizes federal reimbursement of state costs arising from the actual removal of oil or other hazardous substances, as defined in section 311(a)(8), 33 U.S.C. § 1321(a)(8) [4] but does not authorize federal reimbursement of state costs in restoring or replacing natural resources. These costs are included in the "costs of removal" only for purposes of section 311(f)(1) liability. Thus, no double recovery is possible under the Act. The Federal Government may recover these costs from the vessel owner or operator only if it has directly incurred them on the state's behalf; but in that instance, the State has not incurred these costs, and therefore has nothing to recover from the vessel owner or operator under state law.

■ The actual costs incurred by the states for the restoration or replacement of their resources, as distinguished from similar costs incurred by the Federal Government on the states' behalf, may be recovered only by the states. Section 311(f)(5) specifically empowers the "authorized representative of any state" to recover these costs, which section 311(f)(4) includes among the costs for which the vessel owner or operator shall be liable. Thus, section 311(f), as amended, provides the states with an alternative federal remedy, imposing strict liability on the miscreant, subject, however, to the limitation on liability contained in that section. States without a specific oil-spill statute are thereby saved the trouble of proving negligence, while states with such a statute may avail them-

4. This section provides:
(8) "remove" or "removal" refers to removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches;

selves of this federal alternative. If the state fails to act to restore or replace damaged resources, section 311(f)(5) requires the President, "on behalf of the public as trustee," to assess and recover from the vessel owner or operator these costs and to apply the sum recovered to "restore, rehabilitate, or acquire the equivalent of such natural resources . . . ."

Nothing in this scheme, however, conflicts with or otherwise preempts any state statute, such as Virginia's, imposing liability on the owner or operator of any vessel which illegally discharges oil, nor does it limit the amount of that liability. Similarly, nothing in the FWPCA precludes the states from imposing civil penalties upon vessel owners or operators who violate state statutes by discharging oil illegally. It merely provides the states with an alternative federal remedy which assures that, either through the action and expenditure of the state or Federal Government, the natural resources of this country will be preserved.

The legislative history of the 1977 Clean Water Act amendments also belies any intent to preempt state law. The Senate Report, for example, contains the following comments:

The committee considered amendments to section 311 to establish liability for damages occurring outside the jurisdiction of any State as a result [of] an oilspill, including compensation for income loss due to damages to property or natural resources. A related amendment creating a new compensation fund covering claims for damages above the spiller's limits of liability funded by a 3-cent-per-barrel throughput fee on oil not already subject to the fees associated with the existing compensation funds, was also considered. The committee deferred action on these proposals and will consider them as part of the comprehensive oilspill liability legislation. *In that context, the provision of liability for damages and a compensation fund which does not preempt State liability requirement would be appropriate.*

Senate Rep.No.95–370, at 65, *reprinted in* [1977] *U.S.Code Cong. & Admin.News,* at p. 4390. The House Report of the bill contains additional indications that, although members of the House supported preemption of state law, this was not accomplished by section 311(f) of the Clean Water Act Amendments, which contained language drafted in the Senate:

New subsection (f)(4) and (5) make governmental expenses in connection with damage to or destruction of natural resources a cost of removal which can be recovered from the owner or operator of the discharge source under section 311. For those resources which can be restored or rehabilitated, the measure of liability is the reasonable costs actually incurred by Federal or State authorities in replacing the resources or otherwise mitigating the damage. Where the damaged or destroyed resource is irreplaceable (as an endangered species or an entire fishery), the measure of liability is the reasonable cost of acquiring resources to offset the loss.

The Senate conferees are committed to consideration in this Congress of pending legislation authorizing creation of an oil spill superfund. Legislation to create such a fund has passed the House (H.R. 6803) and has been referred to the Senate Environment and Public Works Committee along with a similar bill reported from the Senate Commerce, Science and Transportation Committee (S. 2083).

These amendments to section 311 will provide interim assurance that adequate funds will be available to clean up most oil spills and will provide a basis against which the Senate Committee can consider the superfund legislation.

The conferees expect that matters raised in this section will be further reviewed in conjunction with consideration of the superfund legislation and of any international agreements on pollution beyond the territorial seas.

House Conference Rep.No.95–830, 95th Cong., 1st Sess., *reprinted in* [1977] *U.S. Code Cong. & Admin.News,* p. 4467.

Various attempts made during the 95th Session of Congress to enact comprehensive federal legislation governing oil spill liability also illuminate Congress' intent in enacting the 1977 amendments to section 311(f) of the FWPCA. These proposals for the creation of a federal "superfund," principally H.R. 6803 and S. 1187, contained language clearly designed to preempt state law in this area. S. 1187, for example, contains the following provision:

> (1) no action may be brought in any court of the United States, or of any State or political subdivision thereof, for damages for an economic loss described in section 103(a) [including natural resource damage, sec. 103(a)(4)], a claim for which may be asserted under this Act . . ."

S. 1187, Sec. 110(a)(1), 95th Cong., 1st Sess.; *reprinted in*, 123 Cong.Rec. S. 5134, 5137 (daily ed. March 30, 1977). These preemption provisions were the source of heated controversy among members of Congress at that time, and ultimately frustrated attempts to produce comprehensive federal oil spill legislation. Explaining Senate reaction to preemption, Senator Edmund S. Muskie stated:

> The committee agreed that *any restriction* of such states' rights would ultimately do little good and be *contrary to this committee's tradition of preserving the rights of States to impose more restrictive requirements* for the purpose of protecting their own citizens *as well as air, water and land resources.*
>
> Because *some Members saw preemption of some innovative state laws as a step backward* from comprehensive oil spill compensation protection, *the committee chose not to preempt* States' rights to their own legislation.

124 Cong.Rec. S. 17449–50 (daily ed. Oct. 6, 1978) (Emphasis supplied).

> The Senate-passed [superfund] bill has absolutely no preemption of State laws, whatsoever. . . . States are allowed to establish liability schemes and other requirements as they see fit.
>
> The Senate staff has suggested going halfway on this key issue and has proposed preemption of state funds to compensate economic and third party damages. . . . I want to emphasize that *existing law [i. e. § 311] contains no restraint on the authority of the States. What has been suggested by the Senate staff is an erosion of existing State authority.*

124 Cong.Rec. S. 19462 (daily ed. Oct. 14, 1978) (emphasis supplied).

The Senate subsequently passed a bill which disclaimed preemption of state law. S. 2083, 95th Cong., 2nd Sess. (Oct. 5, 1978). Although subsequent to the enactment of the Clean Water Act of 1977, Congress' reaction to attempts to achieve comprehensive preemption reveal that Congress, especially the Senate where the language amending section 311(f) originated, clearly did not view the 1977 amendments to the FWPCA as preempting state law in this area.

■ For the foregoing reasons, this Court is of the opinion that the Clean Water Act of 1977 amendments to the FWPCA did not preempt state created liability for oil spills, and that no part of Virginia's claim under state law for damage to its natural resources has been satisfied by the settlement between Allied and the United States, discharging Allied's liability under the FWPCA.