# Effect of 31 U.S.C. § 484 on the
# Settlement Authority of the Attorney General

A proposal whereby sums received in settlement of a suit brought by the United States and the Commonwealth of Virginia for environmental damage resulting from an oil spill would be donated to a waterfowl preservation organization, is barred by 31 U.S.C. § 484, which requires that all money received for the use of the United States be deposited in the Treasury. This requirement furthers the constitutional goal of reserving to Congress responsibility for determining whether and how public funds are to be spent.

While the Comptroller General has found § 484 inapplicable in situations where the funds involved are received in trust for a particular purpose, this theory is usually insufficient to override the mandate of § 484 where the trust is created by nonstatutory executive action.

In this case, where the United States has not incurred any monetary loss as a result of the oil spill, § 484 would not be offended by a settlement that attributed the entire sum received to its co-plaintiff, which could then direct the money to a charity.

June 13, 1980

## MEMORANDUM OPINION FOR
## THE ASSOCIATE ATTORNEY GENERAL

This responds to your request for our views concerning the Justice Department's authority to approve the proposed settlement in *In re Complaint of Steuart Transportation Co., etc.* (E.D. Va.-Civ. No. 76-697-N). For the reasons discussed below, we conclude that the settlement as proposed is barred by 31 U.S.C. § 484 (1976). However, it would be possible to modify the settlement in this case to achieve the same result without violating § 484.

In our view, the issues surrounding your authority to compromise this suit derive from more fundamental questions involving the extent of executive authority to bring nonstatutory suits on a public trust/ *parens patriae* theory.[1] However, we do not address the question of independent executive authority to sue in this memorandum because we feel that the court's opinion has effectively mooted the question for purposes of this suit.[2] Instead, we will focus on the legal implications of

---

[1] The government should consider the same questions of authority when it fashions its initial claim for relief as when it negotiates the settlement decree. In this case the government would address the same issues regarding disposition of money whether it received a damages award pursuant to a consent decree or a final judgement after trial.

[2] Although the court's opinion in *Steuart* clearly finds authority for the public trust/*parens patriae* action, it does not indicate whether this authority resides in the federal or state plaintiff (or in both). *See* 495 F. Supp. 38, 40 (E.D. Va. 1980).

the proposed disposition of money damages obtained in this suit either through settlement or final judgment.

## I. Facts

The United States and the Commonwealth of Virginia have sued Steuart Transportation Company alleging that it caused an oil spill in the Chesapeake Bay. Each sovereign sought: (1) damages for the death of migratory waterfowl, (2) statutory penalties, and (3) cleanup costs (including pre-judgment interest). One aspect of the proposed settlement is that the federal and state government would share an entitlement to damages for the death of the waterfowl.[3] Under the terms of the settlement, this money would be "donated by Steuart" to a waterfowl preservation organization to be designated jointly by the State of Virginia and the U.S. Department of the Interior. The State of Virginia has notified us that it is ready to approve the proposed settlement.

## II. Discussion

The Constitution commits to the legislative branch of government control over public expenditures. U.S. Const. Art. I, § 8, cl. 1; *id.,* Art. I, § 9, cl. ·7. Congress has passed various statutes designed to ensure that congressional prerogatives under this constitutional scheme are not diminished by executive action.[4] Of particular significance is 31 U.S.C. § 484, which provides that:

> The gross amount of all moneys received from whatever source for the use of the United States, except as otherwise provided in section 487 of this title, shall be paid by the officer or agent receiving the same into the Treasury, at as early a day as practicable, without any abatement or deduction on account of salary, fees, costs, charges, expenses, or claim of any description whatever.

The sponsor of § 484's predecessor statute indicated in House floor debates that the original statute was intended to "carry out both the spirit and letter of the Constitution." Cong. Globe, 30th Cong., 1st Sess. 466 (1848) (remarks of Rep. McKay). Representative Toombs, another supporter of the original bill, explained its purpose and constitutional underpinnings as follows:

> This bill sought simply to put all the money into the public treasury, and draw it from the public treasury by law, according to the requirements of the Constitution, so

---

[3] The government originally claimed damages for the waterfowl on a *parens patriae* theory, but it did not seek criminal penalties under the Migratory Bird Treaty Act, 16 U.S.C. § 707.

[4] *See, e.g.,* 41 U.S.C. §§ 11-14 concerning public contracts.

> as to get rid of the difficulty of spending two or three millions without authority of law, as we now did.

*Id.* at 475.

The opinions of the Comptroller General construing § 484 tend to emphasize the prerogatives of the Congress and find exceptions to application of § 484 only when supported by a clear expression of congressional intent. For example, on several occasions the Comptroller General has ruled that funds derived from vending machines on government-owned or -controlled property may not be used for employee recreation or welfare activities but must be deposited in the Treasury pursuant to § 484. 32 Comp. Gen. 124 (1952); 32 Comp. Gen. 282 (1952). On the other hand, the Comptroller General has found § 484 inapplicable in situations where a legislative scheme implied a congressional intent to make particular programs self-sustaining. *See, e.g.,* 22 Comp. Gen. 1133 (1943) (War Materials Insurance Program), 23 Comp. Gen. 652 (1944) (Soil Conservation Act), 24 Comp. Gen. 847 (1945) (Lend Lease Act).

The Comptroller General also has recognized a distinction between trust funds and other monies received for the United States for purposes of § 484. For example, in 51 Comp. Gen. 506 (1972), the Comptroller General noted that revenues generated by the Smithsonian in operating the National Zoo were revenues derived from the use of both appropriated funds and Smithsonian trust funds. Despite the fact that the bulk of the administration of zoo operations is supported by appropriated funds, the Comptroller General agreed that § 484 need not apply to zoo operations so long as full disclosure is made to the Congress of the gross amount of all receipts realized from zoo activities that are supported by appropriated funds.[5] The Comptroller General has also indicated in dictum that § 484 would not require that money received by the United States in trust for a particular purpose be deposited in the Treasury. 27 Comp. Gen. 641 (1948). However, in that case the Comptroller General carefully scrutinized the underlying law and facts and determined that no proper and legal trust had in fact been created. Accordingly, the Comptroller General ruled that the money must remain in the Treasury unless and until Congress appropriated it for a particular purpose.

The Office of Legal Counsel has also read § 484 to have a fairly broad application. For example, we have advised the Federal Bureau of Investigation (FBI) that, absent legislation to the contrary, money generated by FBI undercover operations must be considered money "received . . . for the use of the United States" and must be deposited in

---

[5] The Comptroller's analysis applying § 484 only to revenues that are derived entirely from the use of appropriated funds is likely to be *sui generis* to the zoo opinion. In any event, this analysis is difficult to apply in the *Steuart* context, where the *parens patriae* litigation was supported by appropriated funds, but the subject of compensation (the birds) was not.

the Treasury pursuant to § 484. We have also advised that Freedom of Information Act fees collected by the FBI must be deposited in the Treasury. However, like the Comptroller General's trust opinions, we have recognized that § 484 should not be applied to money given to the government which is not available to the United States for disposition on its own behalf. Thus, we advised that money received by the FBI from an insurance company to purchase a stolen car is not subject to § 484. We have also advised that money received by private entities working with the government may not be subject to § 484.[6]

There are no judicial precedents construing § 484 that would assist us in analyzing the *Steuart* case. However, the Ninth Circuit held in *Emery* v. *United States,* 186 F.2d 900, 902 (9th Cir. 1951) that money for rental overcharges paid by landlords to the Treasurer of the United States pursuant to a court order was held by the government in trust for the tenants. Since the money held in trust did not involve any appropriation by Congress, the court concluded that payment of the money by the United States to individual tenants would not be an unlawful appropriation in violation of Article I, § 9 of the Constitution. Similarly, in *Varney* v. *Warehime,* 147 F.2d 238, 245 (6th Cir. 1945), the Sixth Circuit held that assessments against milk handlers to cover the expenses of the War Food Administration were trust funds which need not be deposited in the Treasury.

Applying these precedents to the settlement of the *Steuart* waterfowl claim, we believe that there are two theories that could be asserted to defend a settlement that did not direct the money into the federal Treasury, as generally required by § 484. The first theory would be that the money was received in trust for the people of Virginia or the United States. The second theory would be that under the terms of the settlement no money was "received" at all.

The argument under the trust theory could be based upon the terms of the settlement (which could explicitly purport to create a trust), the two Comptroller General opinions cited above which recognize exceptions to the application of § 484 to *bona fide* trusts, and the two circuit court cases that find no constitutional infirmity in the use of funds received in trust by the Executive without explicit legislative authorization of the expenditure.[7] The weaknesses of a trust argument are: (1) that trusts created by nonstatutory executive action could indeed be used to circumvent legislative prerogatives in the appropriations area; (2) that to some extent all money held in the Treasury or recovered by

---

[6] There are also Comptroller General precedents to this effect. *See* 44 Comp. Gen. 87 (1964) (involving an entity established with federal funds but maintained through grants from a state university).

[7] There is also some weak legislative history to § 484's predecessor statute from which it could be argued that at the time the original statute was enacted, Congress recognized that trust funds were different from other public funds. *See* debate on the amendment proposed by Representative Hall, *Cong. Globe,* 30th Cong., 1st Sess. 466 (1848).

the United States in litigation is received "in trust" for the citizenry; and (3) that Congress has created or recognized trust funds explicitly in numerous cases [8] and implicitly in others,[9] but it has neglected to do so in this context.[10] On balance, we must conclude that the trust argument is insufficient in this case to override the legislative mandate of § 484.

Under the settlement as it is presently structured, we must also reject the argument that § 484 does not apply because no money has been received. In our view, the fact that no cash actually touches the palm of a federal official is irrelevant for purposes of § 484, if a federal agency could have accepted possession and retains discretion to direct the use of the money. The doctrine of constructive receipt will ignore the form of a transaction in order to get to its substance. Although this doctrine originally developed in the context of tax cases, *see, e.g., Bennett* v. *United States,* 293 F.2d 323 (9th Cir. 1961) and *Pittsburgh-Des Moines Steel Co.* v. *United States,* 360 F. Supp. 597, 600–601 (W.D. Pa. 1971), it should apply in this context as well, if § 484 is to be given any practical effect.[11] Since we believe that money available to the United States and directed to another recipient is constructively "received" for purposes of § 484, we conclude that the proposed settlement is barred by that statute.

On the other hand, we do not believe that § 484 would be offended by a settlement that attributes the entire sum of money received to our co-plaintiff, the Commonwealth of Virginia. The Commonwealth has an independent claim to these damages, grounded in the traditional *parens patriae* authority of state sovereigns. It should also be noted that the Commonwealth's independent right to compensation for oil spills was upheld in *In re Complaint of Allied Towing Corp.,* 478 F. Supp. 398, 403 (E.D. Va. 1979), and is recognized in the Federal Water Pollution Control Act. 33 U.S.C. § 1321(f)(4)–(5). Since the United States has not incurred any expense or monetary loss in connection with the lost wildlife, we see no reason why the Justice Department would be

---

[8] 31 U.S.C. § 725s contains a listing of numerous trust funds that Congress has recognized. The section provides that "all moneys accruing to these funds are hereby appropriated and shall be disbursed in compliance with the terms of the trust."

[9] *See, e.g.,* the trust funds found in *Emery,* 186 F.2d 900, and *Varney,* 147 F.2d 258.

[10] It should be noted that one year after the *Steuart* oil spill, the Federal Water Pollution Control Act was amended to permit the state or federal government to recover the cost of replacement or restoration of natural resources as a clean-up cost, and to permit the United States or a state government to sue on behalf of the public as trustee of the natural resources and to use sums recovered to rehabilitate the natural resources. 33 U.S.C. § 1321 (f)(4)–(5) (Supp. III 1979).

[11] The doctrine of constructive receipt also has been applied by federal agencies in defining prohibitions on the acceptance of gifts and honoraria by federal employees. *See, e.g.,* 11 C.F.R. § 110.12(b)(5), which defines "accepted" in the following way:

> "Accepted" means that there has been actual or constructive receipt of the honorarium and that the federal officeholder or employee exercises dominion or control over it and determines its subsequent use. However, an honorarium is not accepted if the federal officeholder or employee makes a suggestion that the honorarium be given instead to a charitable organization which is selected by the person paying the honorarium from a list of 5 or more charitable organizations provided by the officeholder or employee.

*See also* the Department of Justice regulation at 28 C.F.R. 45.735–12(e).

obligated to seek these damages in lieu of the state plaintiff. If the damages are received and directed to a charity by the state plaintiff, § 484 would not be implicated.[12]

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[12] Although we have concluded that the *Steuart* settlement as proposed is barred by § 484, we must note that the same procedure would be expressly authorized for subsequent oil spills by the amendments to the Federal Water Pollution Control Act, 33 U.S.C. § 1321(f)(4)–(5).